UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
ANGEL L. ALVELO RIVERA,

      Plaintiff,

     - against –

MICHAEL ASTRUE
COMMISSIONER OF SOCIAL SECURITY

       Defendant.
------------------------------------------------------- x

**MEMORANDUM & ORDER**

10 CV 4324 (RJD)

DEARIE, District Judge.

  Plaintiff Angel Rivera challenges the Commissioner of the Social Security Administration's ("SSA") denial of Supplemental Security Income ("SSI") benefits for his claimed disabilities, which include diabetes, neuropathy, headaches, arthritis, and severe depression.  ECF Docket # 16, Record ("R.") at 16, 18, 66, 69.[1]  The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing that the administrative law judge's ("ALJ") decision is supported by "substantial evidence" in the record, including plaintiff's testimony, and that the ALJ applied the correct legal standards.  Def.'s Mem. at 2.  In response, plaintiff asserts that (1) the ALJ improperly rejected plaintiff's claims of pain and depression as not credible; (2) the ALJ violated the "treating physician rule" by affording insufficient weight to the opinion of plaintiff's primary care physicians; and (3) the ALJ failed to fully develop the record of plaintiff's mental illness, as is required for pro se litigants.  Pl.'s Mem. at 3-9.  For the reasons stated below, the Court remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

---

[1] Hereinafter, "R." refers to the compilation of documents prepared by the SSA's Office of Disability Adjudication and Review for review by the Court.

# I. BACKGROUND

A. Medical History: 1995-2007

Plaintiff is a 56-year-old native of Puerto Rico who has lived in the United States on and off since 1974.  R. at 29-30.  Plaintiff was diagnosed with diabetes in 1998, kidney stones in 2000, and arthritis, asthma, high cholesterol, and neuropathy in 2002.  R. at 256.  Records from Grupo Medico Enmanuel, a Puerto Rican clinic, show that from 2005 to 2007, plaintiff's diabetes was uncontrolled, with consistently elevated blood sugar and Hemoglobin A1C levels. R. at 156-64; see also R. at 182-84.

Plaintiff also suffers from severe depression and suicidal ideation, which resulted in at least five suicide attempts.[2]  Despite numerous bouts of depression without meaningful recovery, plaintiff apparently received no mental health care beyond two years of treatment prior to 1995 in Puerto Rico, until the period immediately preceding his application for SSI benefits in January of 2008.  R. at 16, 190, 197.

Plaintiff was last gainfully employed in February of 2007, at which time he quit his job in construction because of dizziness, depression, "nerves," and pain stemming from his arthritis and diabetic neuropathy.  R. at 33, 38, 188.  Plaintiff claims he felt the neuropathic pain throughout his entire body, but especially in his brain, his hands, and his feet, and that the neuropathy induced lethargy and swelling of his legs, which made working difficult.  R. at 38-39, 42.

---

[2] Plaintiff reported elsewhere up to ten suicide attempts. R. at 190. Plaintiff first attempted suicide around 2002 when he attempted to drive off a bridge, but crashed his car into the side railings.  R. at 280.  Also in approximately 2002, plaintiff reportedly injected himself twenty-five times with insulin in the stomach. Id. In 2006, plaintiff placed a gun in his mouth, but fired the bullet into the air instead.  R. at 34.   In 2007, he tried to jump from a moving subway train, but was restrained by his brother.  R. at 40.

Between August 31 and September 18, 2007, plaintiff underwent biopsychosocial examinations at FEGS Health and Human Services,[3] which revealed major depressive disorder as well as physical ailments. R. at 186-212. Plaintiff reported to FEGS that "[n]early [e]veryday" he felt depressed or hopeless; had trouble falling or staying asleep or sleeping too much; felt tired or had little energy; felt bad about himself; had trouble concentrating; and thought he would be better off dead or hurting himself in some way. R. at 190. These feelings made it "[e]xtremely [d]ifficult" for him to do work, take care of things at home, and get along with other people, although plaintiff acknowledged that he could wash dishes and clothes, sweep the floor, vacuum, watch television, shop for groceries, cook meals, read, socialize, bathe, and get dressed. R. at 191. Plaintiff denied having any immediate intent to take his life, but reported that he thought about suicide on a daily basis. R. at 198. In addition, he complained of decreased concentration, insomnia, agoraphobia, panic attacks, crying spells, and "near-persistent anxious mood and fears," R. at 195, including of traveling alone and "being in the city." R. at 191.

On August 31, 2007, plaintiff scored a 19 on the Patient Health Questionnaire ("PHQ")-9—a screening tool for depressive syndromes—a score, which corresponds to moderately severe depression. R. at 192, 200-01. A Phase II psychiatric exam found that plaintiff was oriented to time and place, possessed sufficient general knowledge, had a neat appearance and normal speech cadence, and appeared cooperative and logical. R. at 206-07. The exam also revealed, however, that plaintiff had "severe" impairments in his ability to follow work rules, accept supervision, deal with the public, relate to co-workers, and adapt to change and stressful situations, and had a "moderate" impairment in his ability to maintain attention. R. at 206. Plaintiff's mood was depressed, and his Global Assessment of Functioning ("GAF") score was a

---

[3] Founded in 1934 by the Federation of Jewish Philanthropies, FEGS is a not-for-profit healthcare network with over 300 locations in the New York City area. About FEGS, FEGS Health & Human Services, http://www.fegs.org/#/about_fegs/ (last visited July 27, 2012).

39.[4]   R. at 207-08.   A physical examination showed that plaintiff suffered from diabetes and associated peripheral neuropathy, lower back pain, hyperlipidemia, and decreased visual acuity bilaterally.  R. at 195.

The examiners at FEGS concluded that plaintiff suffered from major depressive disorder, severe, R. at 197, and labeled him "[t]emporarily disabled from work," but projected he would be able to return to full-time employment within six months if he received proper mental health treatment.  R. at 209.  FEGS recommended that plaintiff obtain outpatient psychotherapy and rehabilitation and begin antidepressant medications.  R. at 209.

B. Care by Treating Physicians

1. Dr. Billy Geris, M.D. (2007-present)

Billy N. Geris, M.D., an internist operating out of BG Medical on Staten Island, first saw plaintiff on October 18, 2007.  R. at 219.  Plaintiff's first exam revealed uncontrolled diabetes, malaise and fatigue, generalized arthritis in his lower leg, mixed hyperlipidemia, and diabetic neuropathy.  R. at 219-20.  Dr. Geris prescribed Cymbalta for plaintiff's neuropathic pain and ordered a series of X-rays performed the same day.  R. at 220.  The X-rays showed early marginal osteophytosis in the lateral patellar margins of plaintiff's knees, straightening of the normal cervical lordosis and early anterior bridging osteophytes in plaintiff's lower cervical spine, and early multi-level degenerative changes in plaintiff's lumbar spine.  R. at 237-39.  The X-rays were otherwise normal.  R. at 237-39.  Dr. Geris prescribed Topamax for headaches,

---

[4] The GAF is a 0-100 scale that "indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning."  Petrie v. Astrue, 412 F. App'x 401, 406 n.2 (2d Cir. 2011).  A score of 39 corresponds to "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1995).

Vicodin for arthritis pain, Lyrica for joint pain, and a continued regimen of Ambien for insomnia. R. at 223, 225.

In February of 2008, Dr. Geris diagnosed plaintiff with bronchitis, benign hypertensive heart disease without congestive heart failure, myalgia and myositis, and thoracic or lumbosacral neuritis or radiculitis, and, in March of 2008, with asthma, gastritis, and gastroduodenitis. R. at 226-30. Chest X-rays performed on February 6, 2008, showed the lungs to be clear, bony structures to be intact, and heart and mediastinal structures to be unremarkable. R. at 234. A March 6, 2008 neurological evaluation revealed mildly decreased range of motion and pain upon extremes of motion in the cervical spine, as well as abnormal spontaneous activities in the left C5-6 nerve roots, consistent with radiculopathy; the exam also showed normal variance in amplitude among all tested nerves and no significant delay in motor and sensory nerve responses. R. at 249-53.

On January 18, 2010, Dr. Geris completed a questionnaire provided by the SSA to assess plaintiff's physical impairments and resulting limitations.[5] R. at 336-40. According to the report, plaintiff had to lie down during the day as a result of his back pain and the prognosis for plaintiff's back and neck pain was "poor." R. at 337. Dr. Geris estimated that plaintiff could sit for up to four hours continuously, for a total of four hours in an eight-hour workday; stand for up to one hour continuously, for a total of four hours in an eight-hour workday; and walk for up to

---

[5] This questionnaire, which was completed after the ALJ rendered his decision, was included in plaintiff's application for review to the SSA Appeals Council. R. at 5, 144-46. Evidence submitted to the Appeals Council becomes part of the administrative record on review in a district court as long as it (1) is new; (2) is material; and (3) "relate[s] to the period on or before the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). Dr. Geris' report qualifies as "new," since it had not yet been written when the ALJ rendered his decision. Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) ("Because the new evidence submitted by [the claimant's mother] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new.'"). It is also "material," as (1) it lends credence to plaintiff's description of his impairments; (2) it "may disclose the severity and continuity of impairments" even though it "did not explicitly discuss [plaintiff's] condition during the relevant time period"; and (3) there is a "reasonable possibility that the new evidence would have influenced the [ALJ] to decide [plaintiff's] application differently." Id. at 193-94 (internal citation and quotation marks omitted). The only question is whether Dr. Geris' report relates to the window of time "on or before the ALJ's decision"—between January 1, 1998, and November 20, 2009, see R. at 16, 23. The ALJ must ascertain the answer on remand.

15 minutes continuously, for a total of 45 minutes in an eight-hour workday.  R. at 338.  Plaintiff would be limited during an eight-hour workday to "[o]ccasionally" lifting or carrying between zero and five pounds, and plaintiff could "[o]ccasionally" bend or reach but could never squat or climb.  R. at 338-39.  Because of his COPD, plaintiff had "[t]otal" restrictions in his ability to work in an area exposed to dust, fumes, gases, or marked changes in temperature and humidity. R. at 339-40.  Dr. Geris reported that plaintiff was "total[ly]" restricted in his ability to work at unprotected heights, to be around moving machinery, or to drive a motor vehicle.  R. at 339. Plaintiff was physically unable to travel to and from work. R. at 340.

2. Dr. Javier Garcia, M.D. (2007-2008)

Plaintiff began seeing his primary psychiatrist, Dr. Javier Garcia, M.D., on November 6, 2007.  R. at 279, 293.  Dr. Garcia's first exam revealed that plaintiff experienced a depressed mood, poor sleep, decreased energy, and passive suicidal ideation.  R. at 279.  Plaintiff also reported hearing voices in times of stress, complained of being stressed about his physical ailments, which were preventing him from working, and described his current level of pain as a seven on a scale from zero to ten.  R. at 279-81.  Although plaintiff did not appear to be suffering from hallucinations or delusions and had a coherent thought process, his mood was depressed and his affect constricted; he scored a 51 on the GAF test.[6]  R. at 282.  Dr. Garcia prescribed Lexapro for plaintiff's depression and Ambien for insomnia, and at a follow-up meeting one week later, directed plaintiff to attend weekly individual therapy sessions.  R. at 212-13, 283. Dr. Garcia noted that he needed more information before he could assess plaintiff's ability to return to work, but that plaintiff continued to have "significant depressive" symptoms. R. at 213.

---

[6] A patient with a score of 51 suffers from "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, supra, note 4, at 32.

At a series of—on average—monthly checkups between February and June of 2008, plaintiff continued to complain that he remained depressed about the limitations his physical impairments imposed on his ability to work, although his psychiatric medications improved his depressive symptoms somewhat, R. at 286, 288, 302, 305, 307; that he continued to have passive suicidal ideation, though less frequently, R. at 302; and that his "major problem" was his neuropathic pain, which was getting worse, R. at 304, 307.  Accordingly, on a New York City Department of Social Services form dated February 20, 2008, Dr. Garcia reported that plaintiff was temporarily unemployable, but did not indicate a date on which he expected plaintiff to be able to return to work.  R. at 215.  In May of 2008, Dr. Garcia assigned plaintiff a GAF score of 56.[7]  R. at 286.

From November of 2007 through June of 2008, as prescribed by Dr. Garcia, plaintiff also attended weekly therapy sessions with Gloria Mendoza at the St. George Clinic.  See R. at 296-308.  Plaintiff also reported that the medication Dr. Geris prescribed had significantly alleviated his psychiatric symptoms.  R. at 300.

C. Consultative Examinations

Under the Social Security regulations, an ALJ is permitted to consider the opinions of medical or psychological consultants retained by state agencies, as well as other outside physicians, psychologists, and medical experts. See 20 C.F.R. § 404.1527(e)(2).  Plaintiff was referred for a consultative exam to Dr. Jerome Caiati, M.D., an internist at Industrial Medicine Associates, P.C. in Queens, and on that same day, plaintiff also underwent a consultative psychiatric evaluation performed by Sanam Hafeez-Khan, Ph.D., also at Industrial Medicine Associates.  R. at 256, 261.

---

[7] A score of 56 corresponds to the same set of symptoms as described by a score of 51. See supra note 6.

1. Dr. Jerome Caiati, M.D.

Dr. Caiati examined plaintiff once, on April 17, 2008.  R. at 256.  At the examination, plaintiff complained of knee pain and balanced himself with a cane, which he claimed had been prescribed by a doctor, but according to Dr. Caiati, plaintiff had no trouble rising from his chair or getting on or off the exam table.  R. at 257.  As plaintiff's treating physicians had done previously, Dr. Caiati diagnosed plaintiff with obesity, diabetes, hyperlipidemia, asthma, diabetic neuropathy, hypertension, and arthritis.  R. at 259.  Yet according to Dr. Caiati, plaintiff had minimum limitations in his ability to reach, push and pull because of shoulder pain; a minimum limitation in his ability to bend because of back pain; a minimum limitation in his ability to climb because of knee pain; and a minimum to mild limitation in his ability to lift because of shoulder, spine, and knee pain.  Id.

Plaintiff's musculoskeletal system showed no scoliosis, kyphosis, or abnormality in the thoracic spine, and he enjoyed full range of motion of the elbows, forearms, and wrists, though his lumbar range of motion testing produced lower back pain.  R. at 258.  Strength in the lower and upper extremities was five out of five, and the exam revealed no evident subluxations, contractures, ankylosis, or thickening; plaintiff's joints were stable and nontender.  Id.  Dr. Caiati found that plaintiff was unrestricted in his ability to sit, stand, and walk.  R. at 259.

2. Dr. Sanam Hafeez-Khan, Ph.D.

Dr. Hafeez-Khan also saw plaintiff just once, on April 17, 2008.  R. at 261.  He reported that while plaintiff did "not seem to have an actual plan or intent of suicide," he did have "active thoughts" about taking his own life.  R. at 262.  Plaintiff complained of anxiety but did not report any symptoms of it; nor did he report symptoms of mania or thought disorder.  Id.  Largely consistent with treating physician Dr. Garcia's findings, although plaintiff's thought process was

coherent and goal-directed, oriented to person, place, and time, and without hallucinations, delusions, or paranoia, R. at 262-63, 281-82, plaintiff exhibited a "[d]epressed and hopeless" affect and a dysthymic mood, and his attention and concentration were mildly impaired because of his physical pain, R. at 262-63.

Dr. Hafeez-Khan concluded that plaintiff was able to understand and perform simple directions, to maintain attention and concentration, and to make appropriate decisions. R. at 263. As a result of his pain and depression, however, Dr. Hafeez-Khan felt that plaintiff would not be able to maintain a regular schedule or perform complex tasks without supervision, and he would have difficulty dealing with stress and relating to others. R. at 263. In addition, Dr. Hafeez-Khan noted that plaintiff's psychiatric problems "may significantly interfere with [plaintiff's] ability to function on a daily basis." R. at 264.

### 3. L. Mesagno

Apparently based solely on a review of plaintiff's medical records, a disability examiner retained by the state named L. Mesagno, completed a Physical Residual Functional Capacity ("RFC") Assessment form on May 19, 2008. See R. at 268-72. Mesagno found plaintiff to have moderate exertional and postural limitations and no manipulative, visual, communicative, or environmental limitations. R. at 269-71. Mesagno concluded that although plaintiff was "partially credible in his allegations of pain and restriction," his pain and restrictions were not serious "to the extent he claim[ed]." R. at 272.

### 4. M. Graff

Similarly based solely on a review of plaintiff's medical records, a psychologist retained by the state named M. Graff, completed a Psychiatric Review Technique Form on June 23,

2008.[8]  R. at 310.  Graff concluded that plaintiff suffered from major depressive disorder, but that this impairment did not meet or equal in severity the listing for affective disorders in the Social Security regulations.  R. at 313.  Graff found that although plaintiff had a "mild" limitation in his ability to maintain social functioning and "moderate" limitations in activities of daily living and maintaining concentration, persistence, or pace, plaintiff had never experienced "repeated episodes of deterioration."  R. at 320.  Graff also determined that plaintiff did not meet the "C Criteria" for listing 12.04 contained at 20 C.F.R. § 404, Subpart P, Appendix 1.[9]  R. at 321.  According to Graff, plaintiff's psychiatric symptoms were "no more than moderate" and his psychiatric treatment appeared to have been beneficial.  R. at 325.

D. Administrative Process

On January 8, 2008, plaintiff applied for SSI, alleging disabilities beginning on January 1, 1998. R. at 16, 120-22. Based on the above-summarized evidence,[10] on June 26, 2008, the SSA denied plaintiff's application for SSI benefits, R. at 55, 58, and on July 31, 2008, plaintiff filed a request for an administrative hearing, R. at 16, 70.

1. Hearing

ALJ David Z. Nisnewitz conducted a hearing on October 14, 2009.  R. at 27.  Plaintiff, who appeared pro se, acknowledged—through a Spanish-language interpreter—that he understood his right to representation and was voluntarily waiving that right.  R. at 29.  The only

---

[8] The Psychiatric Review Technique Form is a standard SSA document on which psychiatric experts, including non-examining consultative psychiatrists like Graff, record their conclusions about a claimant's mental impairments and limitations.  See Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520(e)(1)).

[9] The ALJ considered plaintiff's depression under the rubric of a mood disorder, which is contained in the Social Security regulations at listing 12.04 in Subpart P of Appendix 1.  Listing 12.04 contains three different sets of possible symptoms, known as paragraphs A, B, and C.  Under the regulations, a mood disorder is considered to meet or equal in severity an impairment in the listings—thus entitling the claimant to benefits—if it either (1) meets the criteria of both paragraph A and paragraph B of listing 12.04; or (2) meets the criteria of paragraph C in listing 12.04.  20 C.F.R. § 404, Subpart P, Appendix 1.

[10] With the exception of Dr. Geris' January 18, 2010, report. See supra note 5.

other witnesses to testify at the hearing were David Festa, a vocational expert, and Leslie Fine, M.D., a psychiatrist maintained on a panel of experts by the Bureau of Hearings and Appeals who had reviewed plaintiff's medical records and was present during plaintiff's testimony.  R. at 28, 49, 52.  Neither Fine nor Festa had ever examined plaintiff.  Neither of plaintiff's treating physicians was present at the hearing.

Plaintiff testified that he had not taken his psychiatric medications "for years" and that he had seen his psychiatrist for the last time around November of 2008.  R. at 41, 48.  He also admitted to noncompliance with diabetes medication prior to 2007 because he had been "traumatized" when his mother's liver "exploded" while she was on the same medication.  R. at 39.  Plaintiff said he still felt depressed, but not suicidal, and that to help himself walk he used a cane, which was not prescribed by a doctor.  R. at 42, 47.  In response to the ALJ's questioning, plaintiff estimated he could lift and carry 20 pounds across the room and walk a total of six to eight blocks, stopping to rest for five to ten minutes between each block.  R. at 46-47.  Plaintiff described his daily activities as watching television and writing letters.  R. at 43.  He testified that he was able to clean the house and cook small things for himself, as well as go grocery shopping with his brother.  R. at 43-44.[11]

Citing plaintiff's positive response to his psychiatric treatment, and his decision to stop receiving mental health care, Dr. Fine, the non-examining psychiatric expert, testified that plaintiff did not "meet[] a listing" in the Social Security regulations.  R. at 50.  Dr. Fine rated plaintiff "moderately limited" in his activities of daily living, socialization, and ability to maintain concentration, persistence, and pace.  Id.  Dr. Fine testified that plaintiff could resume

---

[11] A close reading of the record reveals several inconsistencies in plaintiff's statements to the ALJ and medical sources, including, but not limited to, the number of times plaintiff attempted suicide and whether his cane had been prescribed by a doctor. On remand, the ALJ may, of course, take such discrepancies into consideration when assessing plaintiff's credibility.

working but would be limited to simple, repetitive, low-stress jobs because of his mood disorder. R. at 51-52.  Vocational expert Festa testified that plaintiff could do unskilled jobs requiring only a light exertional level, including working as a racker, electrode cleaner, or laundry worker.  R. at 52-54.

### 2. ALJ's Decision

In a decision dated November 20, 2009, the ALJ determined that plaintiff's asthma, obesity, arthritis, depression, and diabetes with neuropathy qualified as "severe" medical impairments under 20 C.F.R. § 416.920(c), R. at 18, but concluded that these conditions did not meet or medically equal in severity one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, as plaintiff had only moderate restrictions in the three functional categories—activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace—and had experienced no episodes of decompensation.  R. at 18-19.  With selective reference to the records of Dr. Geris, Dr. Caiati, Dr. Garcia, Dr. Hafeez-Khan, and Dr. Fine, the ALJ then determined that plaintiff lacked the RFC to perform past relevant work as a construction worker, but had the RFC to perform simple, repetitive work.  R. at 19-21.  The ALJ adopted the vocational expert's opinion that plaintiff could take a job as a racker, electrode cleaner, or laundry worker.  R. at 22-23.  The ALJ, therefore, denied plaintiff's application for SSI benefits.  R. at 23.

### 3. New Evidence and Review by the Appeals Council

Following the ALJ's unfavorable decision, plaintiff filed a motion for review by the Appeals Council, which the SSA received on December 10, 2009.  R. at 8-9.  On May 8, 2010, plaintiff forwarded to the Appeals Council a copy of Dr. Geris' January 18, 2010 report.  R. at 144-45, 336-40; see supra, Part I.B(1).  When the Appeals Council denied plaintiff's request for

review on July 27, 2010,[12] R. at 1, the ALJ's decision then became the final decision of the Commissioner.  See 20 C.F.R. § 404.981.

E. Instant Matter

On September 17, 2010, plaintiff filed the present action, seeking reversal of the Commissioner's decision.[13]  ECF Docket # 1, Complaint.  On June 27, 2011, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c).  Def.'s Mem. at 1-2.

## II. DISCUSSION

A. Applicable Legal Standards

"Under Rule 12(c) . . . a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law.'"  Guzman v. Astrue, No. 09 Civ. 3928(PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (Castel, J.) (quoting Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990)).  "Judgment on the pleadings is appropriate where 'a judgment on the merits is possible merely by considering the contents of the pleadings.'"  Id. (quoting Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988)).

The Social Security regulations consider an individual "disabled" if he or she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

---

[12] Although framed as a declination, the Appeals Council's determination of whether to review an appeal necessarily requires examination of the record.  Under the Social Security regulations, the Appeals Council will agree to review a case if "(1) There appears to be an abuse of discretion by the administrative law judge; (2) [t]here is an error of law; (3) [t]he action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or (4) [t]here is a broad policy or procedural issue that may affect the general public interest."  20 C.F.R. § 404.970(a).

[13] Plaintiff reapplied for SSI benefits on November 9, 2010, and was found disabled for a period beginning on that date.  See Pl.'s Mem. at 2; ECF Docket # 15.  The Commissioner's decision on that subsequent application is not before the Court for review.

To qualify for benefits, an applicant's physical or mental impairments must be so severe that, "considering his age, education, and work experience," he or she can neither perform his or her past work nor "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The SSA has set forth a five-step procedure to determine whether an applicant is "disabled" within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). The Second Circuit has described that procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (internal citation omitted). Although it is the plaintiff's burden to establish disability at "step one" through "step four," this burden shifts to the ALJ at "step five." Id. (internal citation omitted).

In the instant case, the ALJ's findings at steps one, two, and four are not in dispute. That is, the parties agree that plaintiff was not engaged in substantial gainful activity at the time of his hearing, that plaintiff's impairments were severe, and that plaintiff lacked the RFC to perform his past work. Plaintiff, however, challenges the ALJ's determination that plaintiff did not meet or medically equal in severity a listed impairment at step three and the ALJ's step-five conclusion that, based on plaintiff's RFC, plaintiff was capable of performing simple, repetitive, low-stress work. See Pl.'s Mem. at 5-7.

14

An ALJ's disability determination, though generally entitled to deference, must be reversed or remanded if it is infected with legal error or not supported by "substantial evidence." Rosa, 168 F.3d at 77 (internal citation omitted). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal citation and quotation marks omitted). Where the ALJ misreads the substance of such evidence or confuses different components of the record before him, remand is appropriate. See Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010) ("Because the ALJ's adverse credibility finding, which was crucial to his rejection of [the claimant's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand.").

Moreover, in order to accommodate "limited and meaningful" review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered. Reyzina v. Apfel, No. 98-CV-1288 (JG), 1999 WL 65995, at *13 (E.D.N.Y. Feb. 10, 1999) (Gleeson, J.) (internal citation and quotation marks omitted). Only then can the Court accurately determine whether the ALJ's opinion is supported by "substantial evidence" and free of legal error while still affording appropriate deference to the administrative decision. Where the ALJ fails to provide an adequate roadmap of his reasoning, remand or reversal is appropriate. See id. at 13-14 (remanding case, in part, due to the district court's inability "to determine whether [the ALJ's] determination [wa]s supported by substantial evidence"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

15

The ALJ's opinion in this case is marred by errors, both legal and factual.  In short, the ALJ (1) failed to weigh the evidence properly and misapplied the "treating physician rule"; (2) failed to provide an adequate explanation for finding that the severity of plaintiff's conditions—both physical and mental—did not meet or medically equal in a severity a disability listing; and (3) failed to develop fully the record on plaintiff's physical and mental limitations, his RFC in particular. As a result, the Court is unable to determine whether the ALJ's decision is supported by "substantial evidence," and remand is appropriate.  Furthermore, while the ALJ did arguably apply the correct legal standards required for determining the credibility of a plaintiff's subjective claims of pain, in doing so the ALJ (4) misconstrued, and thus misapplied, the underlying evidence in this case.  The ALJ's credibility determination is not supported by "substantial evidence," and for this additional reason, the case is also remanded.

B. Legal Errors Prevent the Court from Determining Whether the ALJ's Decision Is Supported by "Substantial Evidence"

1. Failure to Weigh the Evidence Properly

"A treating physician's opinion is entitled to controlling weight with respect to the nature and severity of a claimed impairment if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  Carvey v. Astrue, 380 F. App'x 50, 51 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(2)).  Affording the opinions of treating physicians controlling weight reflects the reasoned judgment that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).

16

The ALJ is not bound to give treating physicians' opinions controlling weight.  If the ALJ gives the treating physicians' opinions less than controlling weight, however, he must specify "good reasons," Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)), and must justify the alternate weight with reference to four factors listed in the Social Security regulations: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist," Brickhouse v. Astrue, 331 F. App'x 875, 877 (2d Cir. 2009) (internal citation and quotation marks omitted) (finding ALJ erred by crediting findings of non-examining state disability adjudicator, who was not a physician, because treating physicians' opinions were entitled to controlling weight in light of the four factors).  Failure to provide "good reasons" for discrediting the opinion of a plaintiff's treating physician or failure to justify the affording of less than controlling weight with reference to the Social Security regulations is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

The ALJ in this case declined to afford *any* weight—controlling or otherwise—to the opinions of either of plaintiff's treating physicians, Drs. Geris and Garcia.  Indeed, the ALJ did not so much as note that Drs. Geris and Garcia were treating physicians in his opinion,[14] let alone explain why he was declining to afford their opinions controlling weight.  The ALJ did not make any reference to Dr. Geris's or Dr. Garcia's findings in reaching his conclusion that plaintiff's impairments did not meet or medically equal a disability listing at step three.  Moreover, notwithstanding the ALJ's assertion that his determination of plaintiff's RFC was "supported by . . . the reports of treating sources," R. at 21, the Court has searched the ALJ's opinion in vain for

---

[14] The only acknowledgment of Drs. Geris and Garcia's status as treating physicians was the ALJ's statements, in passing, that plaintiff "has been treated" by those doctors.  R. at 19, 20.

an explanation of how the treating physicians' reports substantiate his step-five conclusion that plaintiff could continue to perform light work.  This absence is unsurprising given that the only opinion from a treating physician to address plaintiff's RFC is found in Dr. Geris's supplemental report submitted to the Appeals Council *after* the ALJ rendered his decision.[15]

In lieu of affording *any* weight to the treating physicians, the ALJ attributed "significant weight" to "the opinions of the medical expert and the consultative examining sources," R. at 21, but he did not specify which of the numerous outside experts and/or consultative sources—Graff, Mesagno, Dr. Fine, Dr. Hafeez-Khan, or Dr. Caiati—he was referring to.   Relying on consultative or non-examining physicians at the exclusion of treating physicians may be permissible, but only if those sources directly contradict the treating physicians' conclusions or the ALJ provides other "good reasons" for doing so.  See Schaal v. Apfel, 134 F.3d 496, 503-05 (2d Cir. 1998) (remanding case, in part, for ALJ's failure to explain less than controlling weight given to plaintiff's treating physician).  Yet just as the ALJ failed to give any explanation for declining to afford plaintiff's treating physicians controlling weight—sufficient in itself for remand—the ALJ also did not explain why he was giving these other unspecified sources controlling weight.  Moreover, it appears that the ALJ gave too much weight to the opinion of Dr. Fine, who failed at the hearing to explain how—if at all—he considered the opinions of plaintiff's treating physicians regarding plaintiff's RFC.   See 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their opinions will depend on the *degree to which they provide supporting explanations for their opinions*.  We will evaluate the degree to which these opinions

---

[15] See infra, Part II(B)(3) for a discussion of the ALJ's duty—and failure in this case—to develop the record by requesting treating physicians' opinions on plaintiff's RFC.

consider all of the pertinent evidence in [the claimant's] claim, *including opinions of treating and other examining sources*.") (emphasis added).

An ALJ must be clear and transparent when weighing the evidence.  Where, as here, no such calculation appears in the record, the district court is unable to determine whether the ALJ's decision should be affirmed.  The ALJ did not give any weight to the treating physicians' opinions and did not explain why he declined to do so.  Moreover, the absence of any explanation for the ALJ's reliance on non-treating sources makes it impossible to assess whether Dr. Geris's and Dr. Garcia's opinions were properly rejected, or alternatively whether other sources were properly accepted.  For these reasons, the case must be remanded.

### 2. Failure to Set Forth "Specific Rationale" for Adverse Step Three Finding

At step three, the ALJ must decide whether a claimant's impairments "meet[] or equal[]" in severity an impairment listed in Appendix 1 of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  When the ALJ makes an adverse finding at step three, the ALJ must justify this determination with more than a brief, conclusory statement that the plaintiff's conditions do not "meet[] or equal[] one of [the] listings in appendix 1 to subpart P of part 404."  20 C.F.R. § 416.920(a)(4)(iii). Instead, the ALJ must "set forth a specific rationale in support of the . . . conclusion."  Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982). Absent such a specific rationale, a court is unable, on review, to determine whether the ALJ's opinion is supported by "substantial evidence."

Failure to set forth a "specific rationale" does not in all cases dictate remand, as where the ALJ's disability determination is supported by "substantial evidence" contained elsewhere in the ALJ's opinion.  Id.  In Berry, for example, although the ALJ did not provide a "specific rationale" for his step-three decision—instead reciting boilerplate language—the Second Circuit

still affirmed because it could "reasonably infer" from the balance of evidence in the record that the plaintiff was not disabled.  Id. at 468-69; see also Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112-13 (2d Cir. 2010) (affirming in absence of specific rationale because "other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate[d] that substantial evidence support[ed] this part of the ALJ's determination.").   The Berry court cautioned, however, that there would be cases in which a court "would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ."  675 F.2d at 469.  In such cases, the Second Circuit "would not hesitate to remand the case for further findings or a clearer explanation for the decision." Id. (internal citations omitted).  This is such a case.

First, the ALJ failed to support his step-three conclusions with a "specific rationale." Id. at 468.  As to plaintiff's physical impairments, the ALJ indicated that he had given "special consideration" to the listings for musculoskeletal, respiratory, endocrine system, neurological, and mental disorders, but without further discussion or analysis, he summarily concluded that plaintiff's "condition [did] not meet or medically equal the criteria of these, or indeed, any of the impairments listed in Appendix 1."  R. at 18; see Berry, 675 F.2d at 467-68 (rejecting near-identical language in ALJ opinion: "'This [ALJ] has reviewed all of the material medical evidence and the claimant's testimony and concludes that this claimant's conditions were not attended by clinical findings that meet or equal in severity the requirements of Appendix 1 (of the relevant regulations).'").  As to plaintiff's mental health impairments, although the ALJ in this case was more detailed in his explanation of the applicable statutory standards, he likewise failed to apply these standards to plaintiff's particular impairments with any degree of specificity.  R. at 18-19.

20

Second, unlike in Berry or Salmini, the balance of the evidence in the record does not permit the Court to "glean the rationale of [the] ALJ's decision," Salmini, 371 F. App'x at 113, especially considering the "credibility determinations and inference drawing" required of the ALJ in this case, Berry, 675 F.2d at 469.  The ALJ's opinion contains a lengthy—if selective— recitation of plaintiff's medical history.  It is not clear, however, which pieces of medical evidence purportedly justify the conclusion that plaintiff's impairments do not "meet or equal" those in the listings.  Nor at any point during his recitation of the evidence did the ALJ attempt to link any given piece of evidence to the disability listings.  In addition, as described supra, Part II.B(1), the ALJ failed entirely to clarify or justify his weight determinations and, as will be described infra, Part II.C, failed to make appropriate credibility determinations.  The balance of the record thus does not cure the ALJ's failure to include a "specific rationale" for his step-three conclusion and the court is, therefore, unable to determine whether this conclusion is supported by "substantial evidence."

On remand, the ALJ must justify—if possible—his reasons for finding that the severity of plaintiff's impairments does not entitle plaintiff to benefits and must do so with sufficient specificity to allow a reviewing court to review such justification.

### 3. Failure to Develop the Record

Given the "essentially non-adversarial nature of a benefits proceeding," the ALJ is under an affirmative duty to develop fully a claimant's medical history when "deficiencies" exist in the record.  Rosa, 168 F.3d at 79 (internal citations and quotation marks omitted).  This duty exists even where a claimant is represented by counsel, id., but takes on increased importance in the case of a pro se plaintiff, Lopez v. Sec'y of Dep't of Health & Human Servs., 728 F.2d 148, 149-50 (2d Cir. 1984) (internal citations omitted), especially one who, as here, is "unable to speak

English well" or at all. Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990).  In cases such as this one, the ALJ has a heightened "duty to make a searching investigation of the record," Cruz, 912 F.2d at 11 (internal citation and quotation marks omitted), and "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (internal citations and quotation marks omitted). There are no more "relevant facts," id., than medical records and opinions of treating physicians on dispositive questions such as the existence and severity of a claimed disability or a claimant's RFC.  See Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (Glasser, J.) ("[T]he duty to develop a full record and to assist a pro se plaintiff *compels* the ALJ to move beyond pro forma compliance with the treating physician rule and to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.") (emphasis added).  Failure to supplement the records of treating physicians, where deficient, constitutes grounds for reversal or remand.  Hankerson v. Harris, 636 F.2d 893, 897 (2d Cir. 1980).

True, the record before the ALJ did contain extensive medical documentation from plaintiff's treating physicians.  The record, however, was devoid of an opinion from either Dr. Geris or Dr. Garcia concerning plaintiff's RFC—the degree to which plaintiff's physical and mental impairments would prevent him from working.  See Connor v. Barnhart, No. 02 Civ. 2156(DC), 2003 WL 21976404, at *5 (S.D.N.Y. Aug. 18, 2003) (Chin, J.) ("In keeping with this heightened obligation [to a pro se claimant], the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; raw data or even complete medical records *are insufficient by themselves to fulfill the ALJ's duty*.") (internal citations and quotation marks omitted) (emphasis added).  The only such evidence in the record before the ALJ—including (1) conclusions about plaintiff's ability to sit, stand, walk, reach, push, pull, bend, climb, and lift;

and (2) an opinion about the effect of plaintiff's mental limitations on his ability to work—came from consultative internist Dr. Caiati, non-examining psychologist M. Graff, and non-examining "disability examiner" L. Mesagno. See R. at 256-60, 268-73, 310-25.  Mesagno's report even made clear that no "treating or examining source statement(s) regarding the claimant's physical [RFC was] in [the] file." R. at 272. The ALJ thus determined plaintiff's RFC without the aid of arguably the most consequential opinions of all: those of Drs. Geris and Garcia.  The ALJ's failure to request such treating physician opinions undercut his ability to adequately evaluate plaintiff's impairments.

Dr. Geris's 2010 report submitted to the Appeals Council two months after the ALJ issued his opinion illustrates well the significance of this failure by the ALJ.  In his report, Dr. Geris reached dramatically different conclusions from those of Dr. Caiati and L. Mesagno—on which the ALJ exclusively relied—regarding plaintiff's physical RFC, including plaintiff's range of motion and ability to sit, stand, walk, lift, carry, bend, squat, climb, and reach. Compare R. at 258-59, 269-271; with 338-39.  In addition, on the PHQ-9[16] depression screening test, Dr. Geris assigned plaintiff a score of 24, R. at 336, which corresponds to severe depression, see R. at 201, while Graff found plaintiff's psychiatric symptoms to be "no more than moderate."  R. at 325. It is unclear whether and how the inclusion of Dr. Geris's report, or any other information from treating physicians on plaintiff's RFC, would have affected the ultimate outcome of plaintiff's claim for benefits.  This uncertainty, however, requires remand.

---

[16] Dr. Geris appears have written in his notes that plaintiff scored a 24 on the "PHQ-2" test.  While the PHQ-2, like the PHQ-9, is a depression screener, it consists of only two questions and is scored on a six-point scale.  See Patient Health          Questionnaire,          American          Psychological          Association. http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health.aspx          (last visited Aug. 1, 2012). The Court, therefore, assumes that Dr. Geris simply committed a recording error in his January 2010 report.  Consistent with his duty to develop the record, the ALJ should clarify this matter on remand.

On remand, the ALJ must elicit Dr. Geris' and Dr. Garcia's views on plaintiff's RFC in light of the physical and mental limitations during the period for which benefits are claimed, consistent with the ALJ's affirmative duty to develop the record.  The ALJ should afford these opinions due weight under the "treating physician rule" when making his final determination of plaintiff's RFC.[17]

C. The ALJ's Credibility Determination on Plaintiff's Subjective Claims of Pain Relied on Factual Errors

When assessing eligibility for Social Security benefits, an ALJ must take into account the claimant's subjective claims of "pain and other limitations," but he need not take them at face value if he has reason to doubt the claimant's credibility.  Genier, 606 F.3d at 49 (internal citations omitted).  In making such a credibility determination, the ALJ must first inquire into whether "the claimant suffers from a medically determinable impairment[ ] that could reasonably be expected to produce the pain alleged."  Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(1)) (internal quotation marks omitted).  If so, the ALJ then must determine whether the objective medical evidence substantiates the claimant's allegations regarding the "intensity and persistence" of the pain.  Id. at 183.  Finally, where the ALJ finds that the medical evidence does not substantiate the claimant's allegations, the ALJ must assess the claimant's credibility by considering seven factors enumerated in the Social Security regulations.[18]  Id. at 183-84 & n.1.

---

[17] To the extent the ALJ determines that the 2010 Geris report submitted to the Appeals Council covers the period "on or before the ALJ's decision," or provides otherwise relevant evidence, the ALJ should also consider it, consistent with the "treating physician rule." Perez, 77 F.3d at 45.

[18] The seven factors are "(1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain." Id. at 184 n.1 (quoting 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

An ALJ who finds that a claimant is not credible must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." Taub v. Astrue, No. 10-CV-2526 (ARR), 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011) (Ross, J.) (internal citation and quotation marks omitted).  The "substantial evidence" the ALJ cites in support of his credibility determination must, of necessity, be accurate.  See Genier, 606 F.3d at 50 (remanding, in part, because ALJ relied on fact that claimant was able to care for his dogs, vacuum, do dishes, cook, and do laundry while, in fact, claimant had indicated only that he *tried* to do such activities but required the assistance of a parent); Taub, 2011 WL 6951228, at *8 (remanding where ALJ found claimant not credible because cognitive impairment did not affect ability to carry out activities of daily living, while claimant had actually stated that his cognitive impairment made it harder for him to function *in a work environment*).

In this case, the ALJ appears to have followed the procedure for assessing the credibility of subjective claims of pain with reasonable fidelity.  See R. at 19-21.  In the process of applying the correct legal standard, however, the ALJ relied on several factual inaccuracies.  For this reason, remand is required.

The Court will refrain from listing all of the inaccuracies contained in the ALJ's opinion, but two particularly egregious ones warrant mention.  First, in concluding that plaintiff was not credible regarding *mental* "pain," the ALJ relied upon the fact that plaintiff "no longer has suicidal thoughts" and that plaintiff "stated that he does not feel suicidal anymore."  R. at 21.  Even a superficial reading of the record indicates that this characterization of plaintiff's mental state is at least incomplete, if not misleading.  While plaintiff's testimony and notes from Dr. Garcia and assistant Gloria Mendoza indicate that plaintiff no longer entertained *active* suicidal

25

thoughts, see, e.g., R. at 42, 279, he frequently reported experiencing *passive* suicidal ideation, see, e.g., R. at 300, 302.  Even Dr. Hafeez-Khan, a consultative psychological expert, reported that plaintiff "has active thoughts about [suicide]," even if he "does not seem to have an actual plan or intent" to take his own life.  R. at 262.  Dr. Hafeez-Khan also observed that plaintiff's psychiatric problems "may significantly interfere with the claimant's ability to function on a daily basis."  R. at 264.  The ALJ seems to have ignored this conclusion altogether in making his credibility determination.

Second, in concluding that plaintiff was not credible regarding his subjective claims of *physical* pain, the ALJ noted that plaintiff had enjoyed a "good response to treatment with medications" for neuropathy and arthritis.  R. at 21.  Nothing in the record supports this conclusion.  Beginning in the late fall of 2007, plaintiff reported to his treating psychiatrist, Dr. Garcia and assistant, Gloria Mendoza, that only his *psychiatric* symptoms had improved somewhat, although he still often felt discouraged and depressed.  See, e.g., R. at 297, 300.  But from the fall of 2007 through the summer of 2008, Dr. Garcia and Mendoza reported that plaintiff continued to experience a significant degree of physical pain resulting from neuropathy, R. at 297; that the pain was getting worse, R. at 298-99; that his primary care physician had told him there was no treatment for the pain, R. at 299; that the pain was keeping him up at night, R. at 299; that his inability to work, which resulted from his pain, was causing him to feel more depressed, see R. at 300; that his pain was not controlled, see R. at 303; and that the medication he had been prescribed for his pain did not help much, R. at 304.  As for Dr. Geris, there is no indication in the record that he changed his opinion at any time regarding the severity of plaintiff's physical pain, which he observed and noted throughout his course of treatment. See generally R. at 216-255.

26

Although generally bound to defer to an ALJ's credibility determination, that restriction does not apply to the Court when the ALJ's conclusion is not supported by "substantial evidence." Cf. Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984) (affirming ALJ's decision that claimant was not credible regarding physical pain where examining physicians' reports, as well as testimony from plaintiff's daughter-in-law, contradicted plaintiff's subjective complaints of pain). Here, because the ALJ's credibility determination is not supported by "substantial evidence," this Court need not—and does not—accept the ALJ's conclusion. On remand, the ALJ must conduct a more thorough and complete evaluation of the record, giving special consideration to plaintiff's continuing passive suicidal ideation and continued neuropathic pain. If, after doing so, the ALJ still believes plaintiff's subjective complaints of pain are not credible, he must explain his conclusion with greater specificity and with proper and accurate reference to evidence in the record.

### III. CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied, and the case is remanded to the ALJ for further proceedings consistent with this Order.

On remand, the ALJ must (1) articulate specific reasons, if still justified, for rejecting the opinions of plaintiff's treating physicians and/or affording more weight to non-examining and consultative sources; (2) explain in specific detail the basis for a determination—if one is warranted—that plaintiff's impairments are insufficiently severe to entitle plaintiff to benefits at step three; (3) elicit the opinions of Drs. Geris and Garcia regarding plaintiff's RFC—including considering the 2010 Geris report, if appropriate—and afford them the weight they are due under the "treating physician rule"; and (4) evaluate plaintiff's credibility based on an accurate reading

of the medical evidence, including plaintiff's continued passive suicidal ideation and the lack of

any suggestion in the record that plaintiff's physical pain was ever responsive to treatment.


SO ORDERED.

Dated: Brooklyn, New York
       August 21, 2012

                                          /s/ Judge Raymond J. Dearie

                                          _____

                                          RAYMOND J. DEARIE
                                          United States District Judge